WALTERS, J.
The court in considering the evidence contained in the record, as to whether the verdict is against the manifest weight of the evidence, is met with a different rule as to its guidance than that which is applied in the ordinary civil action of the code.
The procedure in relation to the contest of wills is regulated entirely by statute, and we may truly say is a special one, being contained in a separate chapter in the code. When the legislature enacts special provisions in regard to procedure they alone govern and exclude from consideration all other general provisions on a related subject.
Section 12083 O. C. provides that:
“On the trial of such issue, the order of probate shall be prima facie evidence of the attestation, execution and validity of the will or codicil.”
Prima facie evidence of a fact, says Mr. Justice Story, is such evidence as in the judgment of the law is sufficient to establish the fact, and if not rebutted remains sufficient for that purpose. Crane v. Morris, 31 U. S. 598 [8 L. Ed. 274].
Prima facie evidence of a fact is such as establishes the fact, and unless rebutted or explained by the evidence becomes conclusive and is to be considered as if fully proved. State v. Burlingame, 146 (Mo.) 207 [48 S. W. 72].
The order of the probate court is in the nature of a judgment, and when that is produced the contestant must then introduce his evidence, and enough of it to countervail the prima facie ease; and when a motion is made by the defendant, at the close of the evidence offered by the contestant, that the court direct the jury to find for the defendant because the contestant has not produced enough evidence to overcome the prima facie case made by the introduction of the order of pro *3 bate, then the trial judge is at liberty, and it becomes his duty, to weigh the evidence, and in so doing he is not bound by the scintilla rule. The scintilla rule applies only to the civil actions of the code, and not to the special proceedings provided for in statute for the contest of wills. Schneider v. Retelbach, 25 Dec. 107 (17 N. S. 124); Kammann v. Kammann, 39 O. C. C. 349 (26 N. S. 60); Hall v. Hall, 78 Ohio St. 415; Strick v. Kiss, 37 O. C. C. 554 (26 N. S. 456).
Should the court have sustained this motion ? Lottie Weide.mer and Mrs. McDonough testified that Mrs. Weidemer, the testatrix, was of unsound mind; Morris Weidemer says she was very feeble-minded. Mr. McQuillan says, “Well, I wouldn’t say that her mind was either or there was something lacking. Yes, there was something lacking.” Stanley Weidemer was not asked his opinion. Roy Weidemer, Celia Weidemer, Mrs. Rampse, Mrs. Worthington and Mrs. Taylor were not asked for their opinion. There is no witness for the contestants who observed her just before or after the execution of the will or at the time of its execution.
The testatrix may have been of unsound mind and yet perfectly capable of appreciating her surroundings, her relations and their deserts, and of her property.
We quote here a synopsis containing all the material points m the testimony of Lottie Weidemer, for she appears to be thu strongest witness for the contestants and the other witness chiefly follows in her foot-steps, and if the contestants make out a case to go to the jury it must be. made out by this witness.
She states that:
‘ ‘ Grandma seemed to think a whole lot of us and was very affectionate, brought us presents, would kiss, eta. When grandma moved to Aunt Ida’s (spring 1906) grandma said: ‘Now 1 live near you and it is easy for you to come. You just take the Swing line. You children must come out to see me. ’ Grandma was glad to see us and wanted us to come back again. Before the sickness in 1909 grandma had rheumatism, but was able to walk around, used cane and held on to things, peeled vegetables, wiped dishes. As long as I can remember her hands were awfully wrinkled, veins prominent.”
*4 Grandma always told us she had heart trouble and it was hard for her to breathe, especially after she had eaten. Sometimes grandma would say she had taken medicine or would asb Aunt Ida if it was time to take it; also she would say, “The doctor said he is going to give me this or that medicine. ’ ’ She frequently put her hand to her heart and complained of a pain there. Her hearing was always poor. She wore glasses. After sickness grandma said it was hard for her to read and she could not darn any more. Witness said her grandma had dropsy in her feet and limbs; would be bad for a day, and swelling go down and maybe it would occur in a few months again.
On the first visit during Mrs. Weidemer’s sickness in 1909 Lottie noticed grandma was propped up in a big easy-chair and had gotten thinner. She had not slept for five or six days; did not talk mueh. She did not lie down in bed for five or six weeks. Doctors gave grandma sleeping powders and she became very drowsy and slept most of the time. After the six weeks she went to her bedroom, and with assistance walked to the kitchen or out on the porch. Asked as to her memory she said :
“Grandma could not remember things very well because when we went out there she would always ask us what we were doing, and if one of the boys were not there and she would asb about him, and she would ask about mother. And maybe we would go out there the very next week and she would ask the same questions over again.
“Then she would be telling us something and she would say, ‘I can’t get it there’ and then she would call Aunt Ida in for her to tell it to me. And then she would start to tell something and stop and say ‘I don’t even remember what I was saying.’ We would sit at her side (one and one-half years after the sickness) and talk to her and she would try to talk to us some, and then maybe we would be saying something to her and she would close her eyes and nod her head and go off to sleep sometimes. She would come back in a few seconds and look a+ us and ask us what she had said. Sometimes she would sleep over fifteen minutes. We would leave the room and grandma would drowse and wake up again. Grandma ate with the rest of the family in the dining-room, fed herself, and walked (some *5 one taking her arm) from, dining-room to kitchen. Grandma complained of being cold, and although there was a stove in the room where she sat she said, ‘The halls and bedroom were so cold. ’ She wanted a furnace put in so the whole house would be comfortable. Furnace was put in in 1910 or 1911, and grandma told Lottie she would help pay for the furnace because it was put in a good deal for her benefit.”
Witness present when grandma gave Maurice his father’s watch (after July, 1909). Then this occurs:
“Did your grandmother ever talk to you about any business matters of any kind?” Answer. “Yes.” “What did she say?” Answer. “She would tell me that she had gotten her dividend cheek and that she had given them to Uncle Lou to take down, that he was coming out perhaps that day and bring the money, or she would say she had just gotten them, he had brought them out the previous Sunday, something of that sort.”
She also remembers graduating from high school in June, 1909; that grandma then gave her a gold cross and Lottie presented grandma with her picture and a bouquet of flowers, and that grandma said, “She was glad I had gotten through so well and she appreciated the flowers very much and liked the picture.” Grandma also gave her ten dollars in gold for her eighteenth birthday, September, 1909, and congratulated ner. She also remembers talking to grandma about her school work at Delaware (1910). Also remembers grandma gave her an opal ring for Christmas, 1910; that grandma told her she wanted her to have a ring and that she (grandma) “had told Aunt Ida to buy it for me.” Lottie had not expressed a desire for an opal ring, but wanted grandma’s engagement ring, which grandma had given to her daughter Ida. Grandma also had this opal ring fixed for Christmas, 1911, as Lottie had lost the setting. About this time, Christmas, 1911, Grandma received h “postal card shower,” and all relatives and friends sending her birthday cards. Lottie sent her one. Grandma was pleased with all the cards and showed them to Lottie. Lottie stayed two days at Gomien’s in the summer of 1910 and states grandma may have peeled some vegetables for the meal then, but does not remember grandma putting on all the things to cook. They *6 liked to go to Gomien’s because they were made at home. Grandma was pleased to see them and complained that they did not come oftener. She. received letters from grandma usually at Christmas time and Lottie wrote grandma letters. Lottie also knows that grandma “took some papers.” Grandma did not read a good deal although she would have liked to. Lottie also stated that she saw her grandma peel vegetables, wash dishes and do light work about the house. Also remembers grandma telling about falling in the kitchen. Also remembers being there when Dr. Iiier was there once, but Lottie did not stay to hear the conversation between grandma and the doctor. Grandma always inquired as to brothers or mother when they did not come out. When they visited grandma they usually sat next to her and talked to her.
On cross-examination Lottie was shown one of her grandma’s letters to George (Lottie’s father). Lottie .admitted it was her grandmother’s letter. This letter was written January 11, 1909.
The letter refreshes Lottie’s recollection. She remembers about her aunt, Mrs. Winterhalter, dying and leaving a will. Part of the letter is read to Lottie about the division of the estate, as follows: “Lottie and the boys were here the day after Christmas and Lottie told us that they thought each one would get about $1,300.” Thereupon Lottie said “I don’t remember definitely about telling her that, but if she said so it was true.” Then question (reading from letter) “Celia comes in for that also, then she can pay for her house.” Do you remember talking to your grandmother about that? Answer: “I don’t remember but I evidently did.” Lottie was again cross-examined and shown another letter of her grandmother’s (Exhibits 23 and 24) page 896 (envelope postmarked Nov. 8, 1910). Lottie reads from this letter: “Lottie is going to the university here in the city. ’ ’ Lottie then states that she started there in the fall of 1910. “Q. (Reading from letter.) It was pretty hard for Ida (picking tomatoes) going out every day and besides doing her housework, but she stood it fine. She said she could not have done the same work last summer and she got fleshy eating tomatoes. Do you know anything about *7 that?” Answer: “I don’t. Q. (Reading letter) ‘She says sbe never ate so many in ber life.’ ” (Counsel for plaintiffs objected.) “Q. She says Lottie Weidemer helped her to pick two days”; is that a fact? Answer: “It is.” And then reading from letter “Q. ‘I can tell you she (Lottie) is a worker and had grit enough to pull her through anything, she undertakes.’ Was your grandmother of unsound mind or not at the time she thought that about you?” (Counsel for plaintiffs objected.) Answer: “I said she was of unsound mind three or four years before her death.” “Q. That is not answering my question. Was she of unsound mind at the time she wrote that about you?” (Objection overruled.) Answer: “I think she was.”
From this evidence and that of other witnesses for the contestants it appears that the testatrix was variously afflicted. She had varicose veins, blue or white. She had rheumatism and indigestion. Her eyesight was bad and she wore glasses. She had an incipient cataract. She had heart trouble and would occasionally gasp for breath. She was forgetful. She would droop her head and when she would waken would have forgot what the conversation had been. Her hearing was bad and she was very feeble, physically and mentally. She had dropsy; her limbs and veins would often swell. She would feed herself at the table but the victuals would fall off the fork or knife— and that would embarrass her. She sometimes would get out of a chair but oftener she would be assisted. She was on good terms with all her children and grandchildren, and would always inquire about them. For five or six days she could not sleep; the doctor gave her a sleeping potion and then she slept practically all the time for five or six days and nights. She was always taking medicine.
When the last will was made Ida Gomien went out in the yard. Testatrix helped her son George with considerable sums of money. In 1909 she got hurt. The will was made April 30, 1911. She died on the- day of-, 1912. She always met her grandchildren with a kiss, and was kind and considerate. On birthdays and at other times she made presents to her children and grandchildren.
*8 There were three wills made, one August 3, 1909, one April 16, 1911, and the one now under consideration April 30, 1911. These wills were offered in evidence and are all substantially alike.
At the time these chief witnesses give evidence concerning their grandmother they were all minors and children, and their testimony in and of itself shows'that the testatrix at all times knew her condition and would speak about it to. these same witnesses. She knew she would drop off into a sleep or become drowsy, and spoke to them about it. She would inquire about her relatives, asking how they were getting along. She said she did not sleep well at night and that is the reason “I am sometimes sleeping in my chair.” She wrote intelligent letters during the time covered by these witnesses.
In all the evidence adduced by the contestants there is no fact or facts testified to by those who gave their opinion that her mind was unsound which would support their opinion.
All these acts were the acts of an old lady enfeebled by disease, but they all show that she recognized her afflictions and her conversation was always of an intelligent character, showing that she knew what she was talking about.
We are unanimous in the opinion that there was not evidence enough introduced by the contestants to overcome or coutervail the prima fade or presumptive ease made by the introduction of the will itself; and we are of the opinion, that the trial judge should have sustained the motion that was made by the defendants at the close of the evidence, and for this error the judgment is reversed.
We might say that there is no evidence in the record of undue influence, and all charges in that respect should have been excluded. Outside of that the charge seems to contain the law.
Proceeding now to render the judgment that the court below should have rendered, judgment will be entered for the contestees.
Middleton and Sayre, JJ., concur.